# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

In the Matter of the Search of:

Facebook username "Joe Copeland" with Facebook User ID#: 100006695238878 and Instagram username "BIGJOEMIL"

)
)
)
)
)
)

Case No. _18-852M(NJ)_

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:  Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846, Title 18, United States Code, Sections 1956 and 1957, and Title 18, United States Code, Sections 924(c) and 2.

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Mark Gorenc, DEA
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: _June 7, 2018_

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Honorable Nancy Joseph _____, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## APPLICATIONS FOR SEARCH WARRANTS

I, Mark J. Gorenc, being first duly sworn, hereby depose and state as follows:

## I.     AGENT'S BACKGROUND AND EXPERIENCE

1.     I make this affidavit in support of an application for a search warrant for information associated with certain Facebook accounts that are stored at premises owned, maintained, controlled, or operated by Facebook, Inc., ("Facebook") a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the specified Facebook and Instagram accounts.

2.     I am a Special Agent with the Drug Enforcement Administration ("DEA"). I have been so employed since September 1996. Prior to my employment with DEA, I was employed as a police officer with the Franklin, Wisconsin Police Department for approximately six months. Prior to that, I was a deputy sheriff with the Milwaukee County Sheriff's Department for approximately two years.

3.     I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

4.     During my tenure as a DEA agent, I have been involved primarily in the investigation of narcotics traffickers operating in the State of Wisconsin and throughout the United States. I have received training in the investigation of drug trafficking. I have worked

with informants in the investigation of drug trafficking; and I have participated in the application of and execution of numerous search warrants, narcotics investigations, and arrests in which controlled substances and drug paraphernalia were seized. Based on my training, experience and participation in drug trafficking investigations and associated financial investigation involving controlled substances, I know and have observed the following:

a. I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

b. I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded and coded. I also know the various code names used to describe controlled substances;

c. I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d. I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business;

e. I know it is common for individuals involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses or other locations over which they maintain dominion and control;

f. I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, and receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. It is common practice for the aforementioned books, records, receipts, notes, ledger, etc., to be maintained where the traffickers have ready access to them;

g. It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these

2

records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence;

h.   It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices;

i.   Likewise, it is common for businesses that engage in transactions with individuals involved in criminal activity to conceal the nature of the transactions through false records such as invoices, by maintaining false financial records, or using a nominee name when performing the transaction. These businesses may need to keep these false records for inventory or bookkeeping reasons. However, these false records may be placed in a separate location such as a personal residence, safe, or safe deposit box for concealment;

j.   I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k.   I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

l.   I know that the Currency Transaction Report (CTR) (Fincen Form 104), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction that exceeds $10,000, causes tremendous problems with drug traffickers when they attempt to negotiate their illegal profits at a financial institution; I further know that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

m.   I know drug traffickers commonly maintain addresses or telephones numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

n.   I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and

3

by those engaged in money laundering activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices; and

o. Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or money laundering activities: computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular / wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

5. Based on the investigation to date, there is probable cause to believe that beginning in at least 2011, until the present, JOSEPH COPELAND, a.k.a. "Big Joe," a.k.a. "Joe Millionaire," (DOB XX/XX/1978) (hereinafter referred to as "COPELAND") knowingly conspired with others known and unknown to possess with intent to distribute and to distribute controlled substances, including at least 500 grams of cocaine and at least 100 grams of heroin, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), and 846. In addition, I submit that there is a probable cause to believe that COPELAND conspired with others known and unknown to commit money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957. Further, there is probable cause to believe that on or about February 20, 2017, JOSEPH COPELAND possessed and discharged a firearm during and in

4

furtherance of a drug trafficking crime, to wit possession with intent to distribute heroin, in violation of Title 18, United States Code, Sections 924(c) and 2. Finally, there is probable cause to believe that evidence of the aforementioned crimes will be found within COPELAND's Facebook records.

6.     This affidavit is based upon my personal knowledge and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation and with whom your affiant has had regular contact regarding this investigation. This affidavit is also based upon information gained from interviews with cooperating citizen witnesses and informants, whose reliability is established separately herein.

7.     The investigation to date has included traditional law enforcement methods, including, but not limited to: confidential informants; information from other law enforcement officers; recorded conversations; controlled buys; documentary evidence; physical surveillance; telephone records; electronic surveillance; and physical seizures. However, because this affidavit is submitted for the limited purpose of securing authorization for search warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested search warrants.

## II.     PURPOSE OF AFFIDAVIT

8.     I make this Affidavit in support of an application for a search warrant for information associated with the following account:

**Facebook username "Joe Copeland" under Facebook User ID#: 100006695238878**

5

**and Instagram username "BIGJOEMIL"**

## III.    FACEBOOK BACKGROUND INFORMATION

9.    Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook permits users to establish individual accounts with Facebook, which can then be used to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public on what is commonly referred to as a Facebook "page" or "profile page."

10.    Facebook requires users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

11.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A

Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

12. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space on the user's page where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

13. Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

14. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on

7

the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

15.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

16.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

17.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

18.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

19.    Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

20.    The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift.

21.    Facebook also has a Marketplace feature, which allows users to post free

8

classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

22.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

23.     Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook also assigns a group identification number to each group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

24.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

25.     Facebook also retains Internet Protocol ("IP") logs for a given username or IP address. These logs may contain information about the actions taken by the user or IP address on Facebook, including information about the type of action, the date and time of the action, and the

9

user and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

26.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

27.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning a subscriber and the use of Facebook, such as account access information, transaction information, and other account information.

IV.     **PROBABLE CAUSE**

28.     This is a joint investigation involving the United States Department of Justice, Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA), and the Milwaukee Police Department (MPD). In October 2015, FBI, DEA and MPD began an investigation into the drug trafficking activities of COPELAND and others. Collectively, these individuals are members of the COPELAND Drug Trafficking Organization (hereinafter referred to as the "COPELAND DTO"), which distributes heroin and cocaine in and around the metropolitan area of Milwaukee, WI. COPELAND has been a large-scale drug trafficker in the

10

Milwaukee area for at least the past ten years. Based upon source information, COPELAND procures shipments of kilogram quantities of heroin and cocaine from known and unknown sources of supply located in Chicago, IL and Milwaukee, WI. Members of the COPELAND DTO supply heroin and cocaine to several high-level drug traffickers operating in the Milwaukee area including, but not limited to, high-level members of the following street gangs: Cheddar Boys, Burleigh Zoo, Uptown 4 Boys, and Bless Team. Based upon source information, phone records, physical surveillance, controlled drug purchases, and MPD police reports, COPELAND and his brother ORLANDO are believed to be in command and control of the DTO.

### A.     Information Obtained from Confidential Sources

#### i.     Information Obtained from CS-1

29.     CS-1 was interviewed by case agents in June 2015 and April 2016 regarding the drug trafficking activities of the COPELAND DTO. CS-1 has known COPELAND, a.k.a. "Big Joe," for several years and identified COPELAND as the leader of the DTO. CS-1 knows COPELAND's brother, ORLANDO, as a co-leader of the DTO. CS-1 stated that COPELAND supplies large amounts of heroin to Burleigh Zoo and Cheddar Boys gang members. CS-1 had been inside COPELAND's residence, which in 2015 and 2016 was at 3031 N. 48th Street in Milwaukee, on several occasions and observed ounces of heroin lying on top of the living room table. CS-1 observed several firearms in the residence and knew that COPELAND regularly carried a black "F&N" semi-automatic pistol.

30.     For several reasons, case agents believe CS-1 is a credible and reliable person. First, CS-1 provided case agents with information concerning individuals involved in drug trafficking, and case agents have independently verified this information. Second, CS-1 made statements to case agents that are against his/her penal interests, in that CS-1 admitted his/her prior involvement in the COPELAND DTO's activities. CS-1 has prior Wisconsin state felony

11

convictions including felony murder – armed robbery, second degree recklessly endangering safety and federal convictions for felon in possession of a firearm and conspiracy to distribute cocaine (5kg – 50kg). CS-1 cooperated with case agents for favorable consideration toward his/her federal possession of firearm by a felon case.

### ii. Information Obtained from CS-2

31. CS- 2 was interviewed in January 2016, regarding heroin sales by the COPELAND DTO. CS-2 has known COPELAND, a.k.a. "Big Joe," for several years and knew COPELAND to be a kilogram-level heroin dealer. CS-2 stated as of January 2016, COPELAND was staying in the upper unit of a duplex on North 48th Street. CS-2 reported that the residence was outfitted with surveillance cameras that allowed COPELAND to see "a few doors down" on each side of the house. CS-2 provided the phone number of 414-722-2999 for COPELAND. According to CS-1, COPELAND had recently received a larger amount of heroin and COPELAND had concealed the heroin in a china cabinet in the residence. CS-2 stated that COPELAND lived there with another subject CS-2 only knew as "Tank."

32. For several reasons, case agents believe CS-2 is a credible and reliable person. First, CS-2 provided information concerning individuals involved in drug trafficking, which case agents have independently verified. Second, CS-2 made statements to case agents that are against his/her penal interests, in that CS-2 admitted his/her involvement in the COPELAND DTO's activities in the past. CS-2 has prior Wisconsin state felony convictions including possession of firearm by felon, possession of cocaine (2nd+ Offense), possession with intent to deliver cocaine (2nd+ Offense), possession of THC (2nd+ Offense), deliver/manufacture cocaine, and federal conviction for conspiracy to distribute cocaine (5kg – 50kg). CS-2 cooperated with case agents for favorable consideration toward his/her federal possession with intent to distribute cocaine case.

### iii. Information Obtained from CS-3

33. CS-3 was interviewed in February 2016, regarding the COPELAND DTO. CS-3 reported that on January 30, 2016, h/she was at COPELAND's residence at 3031 N. 48th Street (Milwaukee, WI) in the upper unit of a duplex. On that day, CS-3 spoke with COPELAND about getting heroin and/or cocaine from him. COPELAND told CS-3 that COPELAND obtained kilogram-sized quantities of heroin and cocaine. COPELAND told CS-3 that if CS-3 wanted 50 grams of heroin or more, the price would be $90 per gram. If CS-3 wanted cocaine, the price would be $1400 per ounce. COPELAND told CS-3 that COPELAND sells 300-400 grams of heroin every three days and typically only dealt with people who wanted at least 50 grams at one time. While CS-3 was inside the residence with COPELAND, CS-3 observed about 250 grams of heroin and four ounces of cocaine on a table. CS-3 also observed two semi-automatic handguns and a "chopper," known to law enforcement as an assault rifle-type of weapon, inside the residence. CS-3 noticed that one of the handguns had an extended magazine. In addition, COPELAND had about $10,000 in U.S. currency in the house at the time.

34. For several reasons, case agents believe CS-3 is a credible and reliable person. First, CS-3 reported information concerning individuals involved in drug trafficking, which case agents have independently verified and corroborated. Second, CS-3 made statements to case agents that are against his/her penal interests, in that CS-3 admitted his/her involvement in the COPELAND DTO's activities. Third, the information provided by CS-3 was consistent with evidence obtained elsewhere in this investigation and substantial portions of CS-3's information have been corroborated through independent investigations, including recorded conversations, surveillance, information from other confidential sources, and controlled buys, including controlled buys made by CS-3. CS-3 has prior Wisconsin state felony convictions including burglary – building or dwelling (two counts), possession of firearm by felon, deliver/manufacture

13

THC, operating vehicle without owner's consent, and escape. CS-3 cooperated with case agents for favorable consideration toward his/her state possession with intent to deliver heroin case.

### iv. Information Obtained from CS-4

35. On June 29, 2016, case agents debriefed CS-4. CS-4 provided information regarding the COPELAND DTO. CS-4 described him/herself as a heroin "middleman." CS-4 stated that "Million," who CS-4 later identified by photograph as BRANDON ELLIS, is a heroin dealer who, at the time of the interview, was operating a drug house that was the lower unit of a white and brown duplex on the west side of North 46th Street between W. Chambers and W. Burleigh Streets in Milwaukee. CS-4 knew that ELLIS's heroin supplier was COPELAND. CS-4 purchased heroin from ELLIS for $60 to $70 per gram and then sold it to CS-4's customers. CS-4 "middled" deals of heroin approximately eight times between July 2015 and June 2016. CS-4 purchased 25 to 75 grams of heroin on each of those occasions and specifically remembered that he/she purchased 75 grams of heroin three of the eight times. CS-4 has been inside of the drug house on N. 46th Street numerous times. In March 2016, CS-4 observed 100 to 200 grams of heroin inside of ELLIS's drug residence. In May 2016, CS-4 observed four to five ounces of heroin and two guns in the residence. CS-4 knew that ELLIS sold other drugs from the residence such as cocaine and marijuana.

36. CS-4 knew COPELAND, who he also knew as "Big Joe" and "Joe Millionaire," was a large-scale heroin dealer; however, CS-4 could not purchase directly from COPELAND. CS-4 identified COPELAND as ELLIS' heroin source of supply. In September 2015, CS-4 wanted to purchase 50 grams of heroin from ELLIS. CS-4 gave ELLIS the money for the 50 grams of heroin. ELLIS then called COPELAND. A short time later, COPELAND stopped in front of the drug house on North 46th Street driving a white Honda rental vehicle. COPELAND was the sole occupant. ELLIS entered the front passenger seat, they drove around the block, and

14

then returned to the drug house on N. 46th Street where CS-4 waited. ELLIS exited the front passenger seat and handed CS-4 the 50 grams of heroin. CS-4 knew Joe TURNER previously worked with COPELAND to sell narcotics, but, at some point, TURNER did not repay a large amount of drug money to COPELAND and they had a falling out.

37.     ELLIS worked with another subject CS-4 only knew as "Craig," who CS-4 later identified by photograph as Craig DELANEY, hereinafter "CD." CS-4 reported that CD's mother lived on N.46th Street, just north of ELLIS's drug house. Case agents are aware that CD's mother lives at 3043 N. 46th Street in Milwaukee. CD typically sold large amounts of cocaine, but he also sold heroin. CS-4 purchased cocaine from CD. CS-4 was aware that at the time CS-4 obtained drugs from CD, COPELAND was CD's drug supplier.

38.     For several reasons, case agents believe CS-4 is a credible and reliable person. First, CS-4 reported information concerning individuals involved in drug trafficking, which case agents have independently verified. Second, CS-4 made statements to case agents that are against his/her penal interests, in that CS-4 admitted his/her personal involvement drug trafficking. Third, the information provided by CS-4 is consistent with evidence obtained elsewhere in this investigation and substantial portions of CS-4's information have been corroborated through independent investigations, including recorded conversations, surveillance, information from other confidential sources, and controlled buys. CS-4 has prior Wisconsin state felony convictions including bail jumping, possession of THC (2nd+ Offense), failure to support child (two counts), and vehicle operator flee/elude officer, and manufacture/deliver cocaine. CS-4 cooperated with case agents for monetary consideration.

                    v.     **Information Obtained from CS-5**

39.     Case agents first interviewed CS-5 in November 2016. Over the course of multiple debriefs, including as recently as November 2017, CS-5 provided information regarding

15

the COPELAND DTO. CS-5 positively identified photos of COPELAND, ORLANDO, TURNER, KD, CD, JINOR, and others as individuals who were are all involved in selling heroin in Milwaukee on behalf of the COPELAND DTO. CS-5 knew COPELAND, a.k.a. "Big Joe" or "Joe Millionaire," to be a large-scale drug dealer who bought cocaine and heroin in kilogram quantities from sources of supply ("SOS") in Chicago, IL. CS-5 identified at least two individuals as COPELAND's sources of supply.

40.     According to CS-5, COPELAND typically drives to Chicago with an associate to pick up cocaine and heroin; however, COPELAND's suppliers also deliver drugs to COPELAND in Milwaukee, WI. COPELAND uses multiple residences in Milwaukee to store drugs and drug proceeds, including his mother's residence at 2870 N. 49th Street and his cousin's, JINOR's, residence at 5123/5125 N. 68th Street. COPELAND also previously used his residence at 3031 N. 48th Street to store drugs and money. CS-5 reported that ORLANDO, COPELAND's brother, a.k.a. "Tank," also lived at the residence on N. 48h Street. CS-5 saw both COPELAND and ORLANDO selling heroin and cocaine to customers in this residence, and CS-5 has observed multi-ounce quantities of heroin and cocaine inside the residence. In addition, CS-5 saw both COPELAND and ORLANDO armed with firearms inside of the residence and saw large amounts of cash inside the residence. There was a functioning camera system that monitored the outside of the house.

41.     Between 2013 and 2016, CS-5 purchased heroin from COPELAND at least 25 times. CS-5 usually purchased between 100-300 grams of heroin on each occasion. COPELAND charged CS-5 $70 per gram of heroin. On one occasion in 2013, COPELAND "fronted" CS-5 a half of a kilogram of heroin in 2013.

42.     Between 2015 and 2016, he/she purchased powder cocaine from COPELAND approximately 18 times. Of those 18 times, CS-5 stated that he/she purchased between one

16

ounce and nine ounces of cocaine about seven times. CS-5 stated that COPELAND charged CS-5 $1300 for one ounce of cocaine. CS-5 stated that COPELAND charged CS-5 $10,800 for nine ounces of cocaine. CS-5 stated that he/she purchased ½ kilogram of cocaine from COPELAND approximately seven times. COPELAND charged CS-5 approximately $21,000 for a half of a kilogram of cocaine. About four times, CS-5 purchased one kilogram of cocaine from COPELAND, and COPELAND charged CS-5 $40,000 for each kilogram of cocaine.

43.     Between 2013 and 2016, CS-5 purchased between 25-300 grams of heroin from ORLANDO approximately 17 times. ORLANDO charged CS-5 $110 per gram of heroin. In addition, between 2015 and 2016, CS-5 purchased powder cocaine from ORLANDO approximately 10 times. On each occasion, CS-5 purchased between one and nine ounces of cocaine. ORLANDO charged CS-5 $1,300 for one ounce of cocaine and $10,800 for nine ounces of cocaine.

44.     CS-5 reported that KD is COPELAND's closest associate. KD and CD sell cocaine and heroin with COPELAND. On several occasions between 2013 and 2016, COPELAND, KD, CD, and CS-5 pooled their money together to purchase two kilograms of heroin from one of the sources of supply in Chicago. When they brought the heroin back to Milwaukee, they used mixing agents to stretch the two kilograms of heroin into four kilograms of heroin. CS-5 further reported that between 2013 and 2016, he/she purchased heroin from KD approximately 40 times. CS-5 typically purchased between 100 and 300 grams of heroin from KD on each occasion, and KD charged CS-5 between $70 and $80 per gram of heroin.

45.     Between 2013 and 2016, CS-5 purchased heroin from CD approximately 15 times, in 25 to 100 gram quantities each occasion. CD charged CS-5 between $70 and $80 per gram of heroin.

46. CS-5 stated that TURNER, a.k.a. "Little Joe," Keiba JOHNSON, a.k.a. "8-ball," Timothy RAWLS, David ROSS, and "D-Boy" are all regular customers of COPELAND. CS-5 identified COPELAND's cell phone number as 414-722-2999 and said that COPELAND has used this phone number for years to arrange drug deals.

47. CS-5 identified JINOR as COPELAND's cousin and reported that she assists COPELAND with his drug trafficking activities and is one of COPELAND's drug couriers. CS-5 reported that JINOR lives in the upper residence of a duplex located at 5123/5125 N. 68th Street in Milwaukee. CS-5 stated that JINOR's mother owns the duplex and lives in the lower residence, 5123 N. 68th Street. CS-5 stated that with JINOR's permission, COPELAND stores drugs and money in both the lower and upper units at 5123/5125 N. 68th Street. CS-5 stated that he/she has observed up to two kilograms of heroin and two kilograms of cocaine inside of the residence.

48. CS-5 stated since approximately 2013, JINOR travels to Chicago to pick up drugs for COPELAND and bring the drugs up to Milwaukee for distribution. CS-5 stated that JINOR travels to Chicago for COPELAND in one of her three vehicles, which CS-5 described as: a newer white Mercedes Benz 4 door (believed to be the white 2016 Mercedes Benz C Class registered to Mildred Jinor); a black BMW 750i (believed to be the black/dark gray 2010 BMW 750Li registered to Latrice JINOR) ; or a black 2004-2005 Volkswagen Touareg (believed to be the 2004 Volkswagen Touareg registered to Latrice JINOR), or in a rental vehicle.

49. CS-5 stated that sometime in the first two weeks of January 2017, CS-5 traveled to Chicago with JINOR. JINOR had a Footlocker bag that was filled with a large amount of money. They traveled to Chicago in the black BMW 750i and arrived at a J.J.'s Fish and Chicken restaurant. The restaurant was in a strip mall with a Footlocker and other stores. CS-5 stated that after they arrived at the restaurant, JINOR exited the vehicle and entered the

18

restaurant while CS-5 stayed in the BMW. CS-5 saw JINOR meet with one of the identified Chicago sources of supply, and JINOR handed the supplier a Footlocker bag and the supplier handed JINOR a different Footlocker bag. When JINOR returned to the vehicle, CS-5 asked JINOR what she did. JINOR replied that she picked up the bag for COPELAND. CS-5 never looked inside of the bag that JINOR received, but CS-5 believed that it contained heroin. JINOR and CS-5 then traveled back to Milwaukee, and JINOR dropped CS-5 off at his/her residence. CS-5 stated that when COPELAND obtains heroin from Chicago, COPELAND obtains four to five kilograms at a time.

50.     For several reasons, case agents believe CS-5 is a credible and reliable person. First, CS-5 reported information to case agents concerning individuals involved in drug trafficking, which case agents have independently verified. Second, CS-5 made statements to case agents that are against his/her penal interests, in that CS-5 admitted his/her involvement in the DTO's drug dealing activities. Third, the information provided by CS-5 is consistent with evidence obtained elsewhere in this investigation and/or substantial portions of CS-5's information have been corroborated through other evidence. CS-5 has prior Wisconsin state felony convictions including manufacture/deliver THC and armed robbery, and federal conviction for conspiracy to distribute cocaine. CS-5 cooperated with case agents for favorable consideration toward pending charges of robbery with use of force (two counts), robbery with threat of force, vehicle operator flee/elude officer, second degree reckless endangering safety, and bail jumping (four counts).

### vi.     Information Obtained from CS-6

51.     Case agents first interviewed CS-6 in May 2017 regarding the COPELAND DTO. CS-6 has known "Big Joe," identified as COPELAND, for the past ten years. CS-6 knows COPELAND is a kilogram-level cocaine and heroin dealer. From 2014 to 2016, CS-6 purchased

25 to 50 grams of heroin, at $85 per gram, from COPELAND at least twice per week. CS-6 picked up the heroin from COPELAND in the upper unit of 3031 North 48th Street. CS-6 purchased ounce to kilogram-sized quantities of cocaine from COPELAND from 2011 to 2014 at rates of $11,000 for 9 ounces, $22,000 for 500 grams, and $44,000 for a kilogram of cocaine. Once COPELAND observed that CS-6 was a good drug dealer, COPELAND dropped the prices to $16,500 for 500 grams and $33,000 for a kilogram of cocaine. CS-6 estimated that he purchased a total of 10 to 15 kilograms of cocaine from COPELAND between 2011 and 2014.

52.    CS-6 also identified JINOR as one of COPELAND's relatives. According to CS-6, JINOR assists COPELAND with the sale and distribution of narcotics. In approximately 2011, COPELAND and JINOR delivered a large quantity of powder cocaine to CS-6's residence. JINOR then showed CS-6 how to process the powder cocaine into cocaine base.

53.    CS-6 stated that ELLIS, who CS-6 knew as "Million" or "Bigs," sells cocaine and heroin for COPELAND. ELLIS used to operate a drug house in the lower level of a duplex in the 3000 block of N. 46th Street, on the west side of the street just south of Lena's Market. Between 2011 and 2014, CS-6 purchased 9 ounces of cocaine for $11,000 from ELLIS on six occasions.

54.    CS-6 stated that KD sells cocaine and heroin for COPELAND. Although CS-6 has never purchased drugs from KD, CS-6 saw KD at the drug house on N. 46th Street with "Million" and was under the impression that KD was running the drug house.

55.    For several reasons, case agents believe CS-6 is a credible and reliable person. First, CS-6 provided information concerning individuals involved in drug trafficking, which case agents have independently verified. Second, CS-6 made statements to case agents that are against his/her penal interests, in that CS-6 admitted his/her involvement in the COPELAND DTO's drug dealing activities. Third, the information provided by CS-6 is corroborated by

evidence obtained elsewhere in this investigation and substantial portions of CS-6's information have been corroborated through independent investigations, including recorded conversations, surveillance, information from other confidential sources, and controlled buys. CS-6 has prior Wisconsin state felony convictions including manufacture/deliver heroin (four counts), possession of firearm by felon, bail jumping, and second degree recklessly endangering safety. CS-6 cooperated with case agents for favorable consideration towards a sentence modification in Manufacture/Deliver Heroin and Possession of Firearm by Felon cases against him/her.

### vii. Information Obtained from CS-7

56. Case agents first interviewed CS-7 in November 2016 regarding the COPELAND DTO. CS-7 has known COPELAND, a.k.a. "Big Joe" or "Joe Millionaire," for many years and knows COPELAND to be a kilogram-level drug trafficker. COPELAND sold cocaine for many years, but in the past few years, COPELAND has also been selling heroin. CS-7 typically purchased five grams of heroin for $400 from COPELAND. CS-7 provided case agents with COPELAND's phone number of 414-722-2999, and CS-7 reported that COPELAND has been using this number for several years. COPELAND and his brother, ORLANDO, previously sold heroin and cocaine from the upper unit of 3031 North 48th Street. CS-7 was inside the upper unit numerous times and observed approximately a kilogram of heroin, several ounces of cocaine, and large amounts of marijuana in the residence. In addition, CS-7 has observed large amounts of money and several firearms in the residence. CS-7 stated that often times COPELAND and ORLANDO were armed in the residence. CS-7 observed a functioning surveillance system monitoring the outside of the residence.

57. CS-7 identified TURNER as a high-level drug trafficker who used to have close ties to COPELAND. TURNER supplied a drug house located at 2934 North 48th Street and CS-

7 had been inside this residence and observed TURNER in possession of large quantities of both heroin and cocaine. CS-7 has observed TURNER in possession of a black semi-automatic pistol.

58.    CS-7 was also familiar with CD and KD and identified them as associates of COPELAND and is aware that COPELAND supplies CD and KD with drugs for distribution. CS-7 has purchased an eighth ounce of cocaine for $175 from KD, who CS-7 knows as "Kal," on two or three occasions in 2016.

59.    CS-7 reported that CD sells cocaine and heroin out of a drug house in the 3000 block of N. 46th Street. CS-7 reported that the house is two houses from CD's mother's residence at 3043 N. 46th Street, which would be consistent with 3049-A N. 46th Street. CS-7 purchased one-eighth ounce quantities of cocaine for $175 each from CD on two separate occasions in 2016.

60.    On May 10, 2018, CS-7 reported to case agents that s/he was inside CD's residence at 3046A N. 46th Street three times in the last month, with the most recent visit on May 8, 2018. CS-7 stated that on one occasion, while inside the residence with CD, CS-7 saw CD walk from the common room of the residence to the basement. Then, CD went to the back door of the residence to meet with an unidentified subject for a brief moment. Soon after, CD returned to the common room. CS-7 reported that although s/he did not observe any narcotics, s/he believed based upon his/her personal experience that CD had retrieved narcotics from the basement and sold them to an unidentified subject at the back door.

61.    For several reasons, case agents believe CS-7 is a credible and reliable person. First, CS-7 gave case agents information concerning individuals involved in drug trafficking, which case agents have independently verified. Second, CS-7 made statements to case agents that are against his/her penal interests, in that CS-7 has admitted his/her involvement in the COPELAND DTO's drug dealing activities. Third, the information provided by CS-7 is

22

consistent with evidence obtained elsewhere in this investigation and/or substantial portions of CS-7's information have been corroborated through independent investigations, including recorded conversations, surveillance, information from other confidential sources and controlled buys made by case agents. CS-7 has a prior Wisconsin state felony conviction including manufacture/deliver cocaine. CS-7 is cooperating with case agents with hopes of receiving favorable consideration toward his/her pending charges of possession with intent to deliver drugs and maintain a drug trafficking place.

### viii. Information Obtained from CS-8

62. Case agents interviewed CS-8 in May 2016, regarding the COPELAND DTO. CS-8 has known COPELAND, a.k.a. "Big Joe," for many years and knows COPELAND is a kilogram-level drug trafficker. COPELAND was initially involved in cocaine distribution, but he began selling heroin in the last couple of years. CS-8 stated that COPELAND and at least one other identified person pool their money together to get shipments of heroin and cocaine. CS-8 stated that COPELAND and this individual give their money to two other identified people, who travel to Chicago to purchase the heroin and cocaine and return to Milwaukee for COPELAND to distribute the drugs.

63. For several reasons, case agents believe CS-8 is a credible and reliable person. First, CS-8 discussed his/her knowledge of individuals involved in drug trafficking, which case agents have independently verified. Second, the information provided by CS-8 is consistent with evidence obtained elsewhere in this investigation and/or substantial portions of CS-8's information have been corroborated through independent investigations, including recorded conversations, surveillance, information from other confidential sources, and controlled buys. CS-8 has prior Wisconsin state felony convictions including possession with intent to deliver cocaine and false imprisonment. CS-8 cooperated with case agents for favorable consideration

23

toward a pending first degree reckless homicide/deliver drugs and possession with intent to deliver heroin cases.

### ix. Information Obtained from CS-9

64. Over the course of multiple debriefs, beginning in December 2017, CS-9 provided information to case agents regarding the COPELAND DTO. CS-9 stated that he/she has known COPELAND since they were in middle school. CS-9 stated that COPELAND is also known as "Big Joe" or "Joe Millionaire." CS-9 stated that COPELAND is a large-scale cocaine and heroin dealer. CS-9 stated that he/she began purchasing cocaine from COPELAND in 2013. For approximately two years, beginning in 2013, CS-9 stated that he/she purchased cocaine either nine ounces or a half a kilogram of cocaine from Copeland twice a week. CS-9 paid COPELAND approximately $8700 for nine ounces of cocaine and between $16,000 and $17,000 for a half of a kilogram of cocaine. CS-9 stated that COPELAND began selling heroin in 2015. CS-9 stated that between the winter of 2015 and December 2017, he/she purchased between 50 and 100 grams of heroin from COPELAND twice a week for between $70 and $80 a gram. CS-9 stated that he/she purchased heroin from COPELAND up until December of 2017.

65. CS-9 stated that COPELAND uses multiple cellular phones at one time. As of December 28, 2017, CS-9 was aware of COPELAND using telephone numbers 414-722-2999 and 262-409-7644 to conduct drug transactions.

66. CS-9 stated that COPELAND opened a new drug house located at 4689 N. 19th St. in Milwaukee, WI after COPELAND's other drug house, 3031 N. 48th St., was home invaded in early 2017. CS-9 stated that ORLANDO, a.k.a. "Tank," lives in the lower unit of the duplex and ORLANDO and COPELAND's aunt lives in the upper unit. CS-9 stated that COPELAND stores large amounts of heroin, cocaine, and fentanyl inside of this residence. CS-9 also stated that he/she has observed a rifle and multiple handguns inside the residence on N. 19th

24

Street. CS-9 stated that COPELAND also has a dehydrator, mixing agents for the narcotics, scales, and large amounts of money. CS-9 stated that COPELAND keeps most of these items inside of a safe that is inside of the residence. CS-9 stated that ORLANDO also helps COPELAND sell narcotics from the residence. CS-9 provided the phone number of 414-759-1517 for ORLANDO.

67. CS-9 stated that CD also helps COPELAND and ORLANDO sell narcotics from the residence at 4689 N. 19th St. CS-9 stated that COPELAND and CD are very close and call each other cousins. CS-9 stated that CD also runs another drug house that is a duplex located at 3049/3049-A N. 46th St. CS-9 has personally observed heroin, cocaine, and firearms inside of both units of this duplex. CS-9 also saw COPELAND deliver heroin and cocaine to CD at this residence.

68. CS-9 stated that COPELAND stores cocaine and heroin at another residence located at 2929/2931 N. 57th St. in Milwaukee, WI. CS-9 stated that he/she has never been inside of the residence, but has seen COPELAND exit the residence possessing large amounts of cocaine and heroin. CS-9 stated that COPELAND has told him/her that he stores large amounts of cocaine and heroin inside of this residence. CS-9 stated that he/she has heard that numerous individuals have purchased large amounts of heroin and cocaine from this residence.

69. CS-9 identified COPELAND's mother's residence as 2870 N. 49th St. in Milwaukee, WI. CS-9 stated that he/she has observed heroin and cocaine inside of this residence. CS-9 also identified 2877 N. 49th St. as a residence that COPELAND told CS-9 in which he lives and owns.

70. CS-9 stated that COPELAND and TURNER, a.k.a. "Little Joe," had a disagreement about money and drugs awhile back, but CS-9 stated that COPELAND and TURNER have since reconciled and that TURNER is again assisting COPELAND with the

distribution of cocaine and heroin. CS-9 identified ELLIS and other individuals as people who work for the COPELAND DTO.

71.     Case agents showed CS-9 a Facebook video that was posted on January 2, 2018, to COPELAND's Facebook page under the username **"Joe Copeland."** The video is a "memory" from January 2, 2015. The video depicts multiple subjects in a night club with COPELAND. CS-9 identified by name one of the subjects with COPELAND. Other cooperating sources identified this person as one of COPELAND's Chicago drug sources of supply.

72.     For several reasons, case agents believe CS-9 is a credible and reliable person. First, CS-9 gave case agents information concerning individuals involved in drug trafficking, which case agents have independently verified. Second, the information provided by CS-9 is consistent with evidence obtained elsewhere in this investigation and/or substantial portions of CS-9's information have been corroborated through independent investigations, including recorded conversations, surveillance, information from other confidential sources and controlled buys. Third, CS-9 has made statements to case agents that are against his/her penal interests, in that CS-9 has admitted his/her involvement in the COPELAND DTO's activities in the past. CS-9 has prior Wisconsin state felony convictions including manufacture/deliver cocaine, possession with intent to deliver cocaine, possession of cocaine (2nd+), and operation vehicle without owner's consent. CS-9 cooperated with case agents for favorable consideration toward a pending manufacture/deliver heroin, manufacture/deliver cocaine, and maintain drug trafficking place cases.

### x.     Information Obtained from CS-10

73.     Case agents began interviewing CS-10 in June 2017 regarding the COPELAND DTO. CS-10 stated that he/she has always known COPELAND as a cocaine and heroin dealer in

the Milwaukee area. CS-10 stated that COPELAND frequently purchases large amounts of cocaine and typically pays approximately $30,000 per load of cocaine. CS-10 stated that COPELAND was recently ripped off for approximately $60,000 in a deal in which COPELAND bought what he thought was drugs but turned out to be a book wrapped to look like drugs.

74.     CS-10 stated that when COPELAND runs out of cocaine and heroin, he drives to Chicago, IL to pick up more. CS-10 believes that this occurs approximately once a week. CS-10 stated that s/he has seen COPELAND in possession of large amounts of money while he was en route to Chicago, IL. CS-10 believes that this was for the purchase of more drugs.

75.     CS-10 stated that COPELAND was recently the victim of an attempted robbery in which his brother was shot. COPELAND shot at the intruders with a personally owned firearm. CS-10 stated that COPELAND has a concealed carry license and had several security cameras at the residence. CS-10 stated that after the attempted robbery incident, COPELAND moved out of that residence and into a new property located at 3149 N. 47th St., Milwaukee, WI.

76.     CS-10 stated that COPELAND has an Instagram account under the name "**BIGJOEMIL**." COPELAND also has a Facebook account under the name "**Joe Copeland**." CS-10 provided two phone numbers for COPELAND: 414-699-9792; and 414-722-2999.

77.     For several reasons, case agents believe CS-10 is a credible and reliable person. First, CS-10 gave case agents information concerning individuals involved in drug trafficking, which case agents have independently verified. Second, the information provided by CS-10 is consistent with evidence obtained elsewhere in this investigation and/or substantial portions of CS-10's information have been corroborated through independent investigations, including recorded conversations, surveillance, information from other confidential sources, and controlled buys. Third, CS-10 is being utilized by DEA Milwaukee and another out of state DEA office and has made controlled buys of narcotics for law enforcement officers in both offices. In

addition, CS-10 has a prior federal felony conviction for fraud by wire, radio, or t.v. CS-10 has received monetary compensation for his/her cooperation with agents.

### xi. Information Obtained from SOI-1

78. On April 4, 2018, case agents conducted an interview of a FBI Confidential Source (hereinafter referred to as "SOI-1") regarding the COPELAND DTO. SOI-1 stated on February 4, 2018, he/she was at CD's residence located at 3049-A N. 46th Street in Milwaukee. SOI-1 stated that along with CD, COPELAND was also at the residence. SOI-1 got into an argument with COPELAND over a personal matter. COPELAND threatened to shoot the SOI-1. COPELAND showed SOI-1 that he was armed with a semi-automatic pistol that had an extended magazine when he threatened to shoot SOI-1. SOI-1 stated that he/she believed that the firearm that COPELAND had was an FN semi-automatic pistol. SOI-1 stated that CD intervened and that the argument was resolved.

79. SOI-1 also stated that he/she was at CD's residence (3049-A N. 46th St.) again during the week before April 4, 2018. During that visit, CD had a large amount of cocaine that he had packaged for sale. SOI-1 stated that CD hides the drugs in containers in his kitchen. SOI-1 described these containers as "California safes," known by case agents to be everyday type of products, like a coffee can, that contain a hidden compartment. SOI-1 stated that although he/she has not seen CD in possession of a firearm lately, he/she has observed CD with firearms in the past.

### B. Controlled Buys/Controlled Contacts/Recorded Calls

80. Throughout the course of the investigation of the COPELAND DTO, case agents have made several controlled buys of heroin from members of the DTO. Based on my training and experience, I know a "controlled buy" is a law enforcement operation in which an informant purchases narcotics from a target. The operation is conducted using surveillance, usually audio

and video taping equipment and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before and after the operation.

81. The informant is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs are then field tested by the case agents for the presences of controlled substances and then placed in inventory pursuant to normal inventory procedures. Calls/texts to the target by the informants are often consensually recorded calls/texts under the direction and control of case agents and made in the presence of case agents. Additionally, case agents observed the informants dial the target's number on each occasion. Unless otherwise noted, the controlled buys and telephone contacts summarized below were conducted pursuant to the above procedures.

82. On February 3, 2016, case agents met with CS-3 to conduct a controlled purchase of heroin from COPELAND. Under the direction of case agents, CS-3 made a consensually recorded phone call to COPELAND at 414-795-4324. COPELAND directed CS-3 to meet him at 3031 N. 48th Street in Milwaukee. CS-3 was provided with $4,500 in "buy money" and a digital recording device. CS-3 was followed by case agents directly to 3031 N. 48th Street where other units already established surveillance. CS-3 entered the residence at 3031 N. 48th Street and purchased 50 grams of suspected heroin from COPELAND for $4,500. The suspected heroin field-tested positive for the presence of opiates with an approximate weight of 50 grams.

83. Case agents interviewed CS-3 following the above-described controlled purchase of heroin. CS-3 reported that he/she an unknown male subject greeted him/her at the residence at 3031 N. 48th Street. Once inside, CS-3 met with COPELAND, who was in possession of a

clear plastic bag that CS-3 estimated contained 200 to 400 grams of heroin. CS-3 counted out $4,500 in front of COPELAND while he broke apart the heroin with a hammer. COPELAND placed chunks of heroin on a scale until it weighed 50 grams. After COPELAND gave CS-3 the heroin, he told CS-3 that he also had cocaine for sale. While in the residence, CS-3 observed a functioning surveillance system with a monitor showing the outside of the residence. During the buy, COPELAND mentioned to CS-3 that his heroin supplier was located in Chicago, IL.

84.     On March 11, 2016, case agents met with CS-3 to conduct a controlled purchase of heroin from COPELAND. Under the direction of case agents, CS-3 made a consensually recorded phone call to COPELAND at 414-795-4324 and arranged to purchase 50 grams of heroin from COPELAND. COPELAND agreed to accept a portion of the payment and give CS-3 heroin on consignment. COPELAND directed CS-3 to meet him at 3031 N. 48th Street in Milwaukee. Case agents supplied CS-3 with a digital recording device and $3,100 in "buy money." Case agents established surveillance of 3031 N. 48th Street prior to CS-3 arriving. CS-3 was then followed by case agents directly to 3031 N. 48th Street. CS-3 parked near the residence and remained in CS-3's vehicle. Case agents observed COPELAND arrive at the location as the driver and sole occupant a burgundy Mitsubishi Eclipse bearing Wisconsin specialized Milwaukee Brewers license plate #5789AB. The license plate is registered to a 2007 Mitsubishi Eclipse registered to WynnJuanita R. Holden, who is believed to be COPELAND's girlfriend.

85.     Case agents saw COPELAND carrying a Gucci bag as he walked towards 3031 N. 48th Street. CS-3 then entered the residence with COPELAND. Once inside, COPELAND gave CS-3 what CS-3 believed to be 50 grams of heroin. CS-3 gave COPELAND $3,100 and agreed to pay COPELAND an additional $1,400 for the heroin in a few days. CS-3 was then followed to a predetermined meet location where CS-3 turned over the suspected heroin and

digital recording device to case agents. The suspected heroin later field-test positive for the presence of opiates with an approximate weight of 50 grams.

86.     After the controlled buy, CS-2 reported to agents that when he/she arrived at 3031 N. 48th Street, CS-3 called COPELAND. Shortly after, COPELAND arrived at the location in a red Mitsubishi two door coupe. CS-3 noticed that COPELAND was carrying a Gucci style bag and they then entered the residence together. COPELAND retrieved a digital scale from a built-in China cabinet and weighed out 50 grams of heroin for CS-3. CS-3 could see what appeared to be a half kilogram of cocaine in the drawer where COPELAND retrieved the scale from. COPELAND then delivered 50 grams of heroin to CS-3, and in return, CS-3 gave COPELAND $3,100 in "buy money" and agreed to pay the balance of $1,400 in a few days. During the transaction, COPELAND told CS-3 that he only had 20 grams of heroin left until he got his next shipment in. COPELAND's Chicago SOS drives the heroin to Milwaukee to deliver to COPELAND on a weekly basis.

87.     On January 11, 2017 case agents met with CS-7 to conduct a controlled buy of heroin from COPELAND. Case agents directed CS-7 to make a consensually recorded phone call to COPELAND at telephone number 414-722-2999. During the call, COPELAND agreed to sell CS-7 five grams of heroin. COPELAND told CS-7 that he would call when he was ready. Approximately an hour and half later, COPELAND called CS-7 and said he would be ready in 30 minutes and directed CS-7 to meet him at 3031 N. 48th Street. Case agents provided CS-7 with "buy money" and a digital recording device. CS-7 was followed directly to 3031 N. 48th Street where case agents observed COPELAND emerge from 3031 N. 48th Street and approach CS-7's vehicle. COPELAND then sold CS-7 five grams of heroin for $400. CS-7 departed and drove to a predetermined meet location where case agents recovered the heroin purchased from COPELAND. COPELAND gave CS-7 six grams of heroin and CS-7 agreed to pay for the extra

gram during the next deal. Case agents later field tested the suspected heroin which tested positive for opiates with a total weight of 6.1 grams.

88. On January 18, 2017, case agents met with CS-7 to arrange a controlled buy of heroin from COPELAND. CS-7 was directed by case agents to make a consensually recorded phone call to COPELAND at 414-722-2999. During this call, CS-7 arranged to purchase five grams of heroin from COPELAND. CS-7 told COPELAND that CS-7 had the money for the one gram owed from the previous drug deal. COPELAND told CS-7 that he would call when he was ready. Approximately two hours later, COPELAND called CS-7 and directed CS-7 to meet him at 3031 N. 48th Street. Case agents provided CS-7 with "buy money" and a digital recording device. CS-7 was followed directly to 3031 N. 48th Street where case agents observed COPELAND emerge from 3031 N. 48th Street and approach CS-7's vehicle. CS-7 then engaged in a hand-to-hand transaction with COPELAND. CS-7 gave COPELAND $480 and COPELAND gave CS-7 five grams of heroin. CS-7 then drove to a predetermined meet location where case agents recovered the heroin purchased from COPELAND. Case agents later field-tested the suspected heroin which tested positive for opiates with a total weight of 5.1 grams.

89. On January 24, 2017, case agents met with CS-7 regarding this investigation. COPELAND was currently out of town; however, COPELAND's brother, ORLANDO, would sell CS-7 heroin. CS-7 made two consensually recorded phone calls to ORLANDO at the number of 414-467-3208. During these calls, ORLANDO told CS-7 to meet him at ORLANDO's house, located at 3031 N. 48th Street. CS-7 was then provided "buy money" and a digital recording device. CS-7 was followed directly to 3031 N. 48th Street where case agents had established surveillance and observed ORLANDO enter the rear door of 3031 N. 48th Street, just prior to CS-7 arriving. Case agents then observed CS-7 enter the front door of 3031 N. 48th Street. CS-7 emerged a short time after and was followed directly to a predetermined meet

location. CS-7 then gave case agents five grams of suspected heroin sold to CS-7 for $400. The transaction took place in the dining room of the upper unit at 3031 N. 48th Street. CS-7 gave ORLANDO $400 in prerecorded buy money and ORLANDO handed CS-7 a bag containing five grams of suspected heroin. Case agents later field-tested the suspected heroin, which tested positive for opiates with a total weight of 4.9 grams.

90.     On February 6, 2017, case agents met with CS-7 to conduct a controlled buy of ten grams of heroin from COPELAND. Case agents directed CS-7 to make a consensually recorded phone call to COPELAND. During the call, CS-7 told COPELAND, "I need ten this time." COPELAND agreed and told CS-7 that he would call when he was ready. Approximately an hour and ten minutes later, CS-7 received an incoming call from COPELAND telling CS-7 that he was ready. Case agents provided CS-7 with "buy money" and a digital recording device. Case agents then followed CS-7 to 3031 N. 48th Street. CS-7 called case agents and reported that COPELAND had directed CS-7 to meet him in the (former) Lena's Market parking lot located at 4623 West Burleigh Avenue in Milwaukee. Case agents observed a dark grey/black BMW 750Li sedan with Wisconsin plates of 606-YNL, registered to JINOR, back out of the driveway of 3149 N. 47th St. in Milwaukee, WI. Case agents observed the COPELAND parked the BMW near CS-7 in the Lena's Market parking lot. CS-7 entered the passenger seat of the BMW. CS-7 remained in the vehicle briefly before returning to CS-7's vehicle. CS-7 was followed directly to a predetermined meet location where case agents recovered the digital recording device and ten grams of suspected heroin. CS-7 reported that COPELAND was the sole occupant of the BMW and handed CS-7 the suspected heroin after CS-7 gave COPELAND $800 in "buy money." Case agents later field-tested the suspected heroin, which tested positive for opiates with a total weight of 10.0 grams.

91.     On February 15, 2017, case agents met with CS-7 to conduct another controlled buy of heroin from ORLANDO. Case agents directed CS-7 to make a consensually recorded phone call to ORLANDO at 414-467-3208. CS-7's call went to voicemail, and shortly after, CS-7 received an incoming call from ORLANDO that was recorded. During the call, ORLANDO agreed to sell CS-7 ten grams of heroin. The transaction was to take place at 3031 N. 48th Street. Case agents provided CS-7 with "buy money" and a digital recording device, and followed CS-7 to 3031 N. 48th Street. Case agents observed CS-7 enter the front door of 3031 N. 48th Street. CS-7 emerged from the same door a short time later and met agents at the predetermined meet location. CS-7 told case agents that CS-7 purchased approximately 10 grams of heroin from ORLANDO for $800. The transaction took place in the living room of 3031 N. 48th Street. Case agents field-tested the suspected heroin, which tested positive for opiates with a total weight of 9.9 grams.

92.     On May 17, 2017, case agents met with CS-7 to make a consensually recorded phone call to COPELAND to arrange a controlled purchase of heroin. Under case agents' direction, CS-7 called COPELAND at 414-722-2999 and arranged to purchase five grams of heroin. COPELAND agreed and told CS-7 that he would call when he was ready. Sometime after the first call, COPELAND called CS-7 and told CS-7 to meet him at 2870 N. 49th St. in Milwaukee, WI. Case agents are aware that this address is the lower unit of a duplex used by COPELAND and his mother, Kathy COPELAND. CS-7 was then provided "buy money" and a digital recording device. CS-7 was followed to 2870 N. 49th Street where case agents were conducting surveillance and observed COPELAND on the front porch of the residence prior to CS-7's arrival. Case agents observed COPELAND enter the residence at 2870 N. 49th Street, followed by CS-7. A few moments later, CS-7 emerged from the residence and was followed by case agents to a predetermined meet location. CS-7 told case agents that CS-7 purchased the

34

heroin from COPELAND while inside 2870 N. 49th Street and paid COPELAND $400. Case agents field-tested the suspected heroin, which tested positive for opiates with a total weight of 5.0 grams.

93.     On September 13, 2017, case agents spoke telephonically with CS-10. Case agents requested that CS-10 place a telephone call to COPELAND to negotiate the price for 50 grams of heroin from COPELAND. CS-10 then placed a three-way call between the case agents, CS-10, and COPELAND at telephone number 414-699-9792. This conversation was consensually monitored. CS-10 requested to purchase 50 grams of heroin from COPELAND for CS-10's cousin. COPELAND advised CS-10 that he was out of town, but stated that he would charge $4,000 for 50 grams of heroin. CS-10 said that his/her cousin is paying CS-10 for brokering the drug transaction. CS-10 advised that s/he would pass the message onto his/her cousin and would let COPELAND know.

94.     On February 6, 2018, case agents met with CS-10 to make a consensually recorded phone call to COPELAND to arrange a controlled purchase of heroin. Case agents directed CS-10 to send a text message to COPELAND's telephone number 414-699-9792 and arrange a purchase of 50 grams of heroin. After a series of text messages were sent to and received from COPELAND, CS-10 then called COPELAND at 414-699-9792. CS-10 was told by COPELAND that he was waiting on the heroin. Approximately 25 minutes later, CS-10 then received a text message to meet COPELAND at the barber shop located at 6520 W. Capitol Drive. Case agents provided CS-10 with "buy money" and a digital recording device and followed CS-10 to 6520 W. Capitol Drive, where case agents were conducting surveillance and observed one of COPELAND's vehicles, the 2010 BMW 750i 4-door sedan, with Wisconsin license plate 606-YNL, parked in the lot. Case agents observed CS-10 arrive in the same parking lot, exit his/her vehicle, and enter the barbershop. CS-10 then met with COPELAND. After a

few minutes, CS-10 and COPELAND exited the barbershop. Case agents were informed that CS-10 was to follow COPELAND to another location. CS-10 then followed COPELAND to 2929/2931 N. 57th St., a residence that cooperating sources have reported is used by the Target Subjects for drug trafficking activities. Sometime later, a subject exited the front door of the residence and entered the front passenger seat of COPELAND's vehicle. After a short meeting, the unknown subject returned to the residence and entered the rear door. COPELAND exited his vehicle and entered CS-10's vehicle. COPELAND then exited CS-10's vehicle and re-entered his vehicle. CS-10 was followed by case agents to a predetermined meet location. CS-10 told case agents that the unknown subject exited a front door of 2929/2931 N. 57th St. and entered COPELAND's vehicle. The unknown subject then exited and went to the back entrance of 2929/2931 N. 57th St. COPELAND then entered CS-10's vehicle. CS-10 paid $4,500 for 50 grams of heroin. CS-10 believed that the unknown subject gave COPELAND the heroin. COPELAND exited the vehicle and CS-10 met case agents at the predetermined meet location. Case agents later field-tested the suspected heroin, which tested positive for opiates with a total weight of 49.84 grams.

95.     On March 27, 2018, CS-10 placed a monitored and recorded phone call to COPELAND's phone number of 414-722-2999. CS-10 had a brief conversation with COPELAND about purchasing additional heroin in the future.

96.     On May 9, 2018, CS-10 placed a monitored and recorded phone call to COPELAND's other phone number, 414-699-9792. CS-10 discussed his/her upcoming plans to travel to Milwaukee to purchase 110 grams of heroin from Copeland for $10,000.

97.     On May 22, 2018, CS-10 conducted another controlled buy of heroin from COPELAND. Prior to the controlled buy, law enforcement initiated surveillance at COPELAND's residence, 3149 N. 47th Street and observed COPELAND's white Range Rover

with Wisconsin license plate AAU9139 parked in the driveway. CS-10 was provided with $10,000 in "buy money." CS-10 had telephone contact via FaceTime with COPELAND at phone number 414-699-9792 about CS-10's purchase of heroin, and COPELAND asked CS-10 to meet at the same place that they did the transaction last time, which was 2931 N. 57th Street. When CS-10 explained that s/he did not remember how to get there, COPELAND instructed CS-10 to meet at the old Lena's grocery store, N. 46th and Burleigh Streets. At approximately 2:03 p.m., surveillance units observed COPELAND exit his residence at 3149 N. 47th Street, enter the driver's seat of the white Range Rover, and drive away. Other surveillance units observed COPELAND's Range Rover arrive at 2931 N. 57th Street at approximately 2:06 p.m. At approximately 2:20 p.m., COPELAND sent a text message to CS-10 that he was on his way. At approximately 2:32 p.m., COPELAND left the area of 2931 N. 57th Street driving the Range Rover. At approximately 2:36 p.m., the Range Rover pulled up outside of Waz's Bar & Grill on N. 46th and Burleigh Streets, across the street from the old Lena's grocery store. COPELAND called CS-10 and told him/her to move his/her car closer to COPELAND. CS-10 parked outside Waz's. Around that time, an unidentified man entered COPELAND's passenger seat of the Range Rover. The man was in the car for less than a minute, exited the car, and ran northbound on N. 46th Street.

98.     At approximately 2:43 p.m., COPELAND entered CS-10's car and provided CS-10 with a small amount of heroin. COPELAND told CS-10 that they would go inside the bar to wait for the rest of the heroin to arrive. COPELAND and CS-10 entered the bar. CS-10 reported that while in the bar, COPELAND had telephone contact with someone listed in COPELAND's phone as "Lil Joe." At approximately 3:10 p.m., surveillance units observed a silver Hyundai Sonata with Wisconsin plates AAS8249 pull up outside the bar. An unidentified black man exited the Hyundai and entered the bar. The man met with COPELAND, and shortly thereafter,

COPELAND handed the remaining heroin to CS-10. CS-10 paid $10,000 for the heroin. In total, COPELAND sold CS-10 approximately 103 grams of heroin in two separate bags for $10,000. Following this transaction, CS-10 had a recorded phone call with COPELAND in which CS-10 complained about being shorted, since the deal was for 110 grams of heroin. COPELAND stated that "Little Joe" had messed up and that COPELAND would make up for the mistake.

## C. Other Law Enforcement Contacts

99. On February 14, 2016, at approximately 3:38 a.m., Milwaukee Police Officers were dispatched to 5703 N 68th St, in Milwaukee, WI, regarding a battery complaint. The victim, S.W., stated that COPELAND had battered her. S.W. stated that she and COPELAND had been in a phone argument on February 13, 2016, regarding COPELAND returning a set of house keys that S.W. had given him. COPELAND was supposed to return the keys, but he did not. S.W. went to bed and was awakened by COPELAND on February 14, 2016, at approximately 3:35 a.m. An argument ensued between S.W. and COPELAND. When COPELAND attempted to exit the front door, S.W. tried to prevent him from leaving with her house key. COPELAND then swung her around and she fell into the snow. COPELAND grabbed S.W. by the front of her shirt with one hand and then released his grip on her shirt and punched her in the face with a closed fist three or four times, causing her pain. When she attempted to get back into her residence, COPELAND placed his arm around her neck area and pulled her back outside. COPELAND struck S.W. in the face with a closed fist one additional time causing pain and causing her to fall to the ground. S.W. got up and observed COPELAND had produced a black handgun from an unknown location and pointed to at S.W. COPELAND stated, "I should shoot you!" S.W. ran upstairs to call the police. When officers arrived, they

observed that S.W. had abrasions on her left temple, her right hand pinky knuckle, and her left thumb.

100.    COPELAND was seated inside of the driver's seat of a silver/gray 2007 BMW X5, 4 door, WI plate 641-YMT, parked to the west of the duplex in the alley on a parking slab, facing east. Officers observed a black FN Five-seveN semi-automatic pistol in plain view sitting on the front passenger seat of the vehicle. Upon recovering the handgun, officers observed there to be one 5.7x28mm cartridge in the chamber of the pistol, and a magazine that was also loaded with thirty 5.7x28mm cartridges. Initially, this firearm and ammunition was seized and placed in evidence. Multiple sources have reported that they have seen COPELAND armed with this same type of handgun. COPELAND was arrested for Battery and Endangering Safety by Use of a Dangerous Weapon. The case was ultimately dismissed when the victim, S.W., failed to appear to court. The firearm was returned to COPELAND.

101.    On February 20, 2017, Milwaukee Police Officers responded to 3031 N. 48th Street in Milwaukee after receiving reports that someone was shot. This is the same address described by multiple cooperating sources as COPELAND's and ORLANDO's drug house. In addition, prior to February 20, 2017, case agents conducted several controlled buys of heroin from both COPELAND and ORLANDO at this residence. Based upon interviews, responding officers learned that at approximately 11:57 p.m. on February 20, 2017, two unknown suspects approached ORLANDO as ORLANDO walked toward the residence. The suspects were wearing hoods and masks over their faces. One suspect was armed with an assault-style rifle, and the second was armed with a pistol. The suspects patted ORLANDO down and took his wallet and his FN .40 caliber semi-automatic pistol from the holster on his waist. The suspects then asked ORLANDO how many people were in the house. ORLANDO responded that there were two people. The suspects instructed ORLANDO to unlock his residence. ORLANDO

39

opened the front door. The suspect with the rifle started to walk up the stairs to ORLANDO's residence and the suspect with the handgun stayed with ORLANDO. ORLANDO reported that he knew that his brother, COPELAND, and his cousin, Jermaine Copeland, were inside the residence. ORLANDO further reported that COPELAND was in possession of a FN Five-seveN semi-automatic pistol.

102. When the suspect with the rifle got to the top of the stairs, ORLANDO heard several shots being fired. The suspects then exited the residence. ORLANDO began to go up the stairs toward the residence when the suspects began firing into the residence. ORLANDO was struck by gunfire. Police officers responded to the scene and ORLANDO was taken to Froedtert Hospital where he needed surgery regarding his injuries.

103. Responding officers observed multiple shell casings strewn about the floor inside the residence, indicating that shots had been fired from multiple firearms inside the residence. Multiple officers reported that the scene was still foggy from recent gunfire and smelled of gunpowder. COPELAND and Jermaine Copeland were in the residence. COPELAND told officers that he was seated in the living room on the couch when the door opened and he saw a masked subject armed with an AR-15-style in the doorway. COPELAND grabbed his FN 5.7 handgun from his lap and fired at the suspect. The suspect fired back at COPELAND. COPELAND told officers that he fired his gun until his 20-round magazine was empty. Eventually the suspect left. COPELAND put the gun on the bed, where it was recovered, and helped ORLANDO. COPELAND's gun was identified as a Fabrique Nationale Herstal (frequently referred to as "FN") Five-seveN 5.7x28 pistol with serial number 386279961. COPELAND stated that ORLANDO owns a 9mm black and chrome handgun. COPELAND stated that after the incident, he retrieved ORLANDO's gun and gave it to one of the officers. This gun was further described as a SCCY CPX-1, 9mm semi-automatic handgun with serial

number 134073. The firearm was loaded with nine rounds of 9mm Lugar brass cartridges and one additional cartridge in the chamber.

104. While conducting the scene investigation, Milwaukee Police Officers recovered from the residence an FN 5.7 x 28 semi-automatic pistol, an FN .40 caliber semi-automatic pistol, two magazines for a "AK"-style rifle, a pistol magazine, numerous fired .223, 9mm, and 5.7 x 28 casings from both inside and outside of the residence, numerous fired bullets, bullet fragments, and cartridges, a digital scale, a grinder, numerous cellular phones, $4,541 in U.S. currency, and 1.55 grams of marijuana. A search warrant was obtained for the residence of 3031 N. 48th Street. Inside a cabinet in the dining room, officers recovered 13.31 grams of heroin and $2,360 in U.S. currency. Based upon my training and experience, 13.31 grams of heroin is a distributable amount of heroin, and is not a personal use quantity. Officers also recovered an automated money counter, drug packaging material, and a digital video recorder from the residence. The residence was also equipped with surveillance cameras that captured the inside and outside of the upper unit.

105. Neighbors reported that "Orlando" and his brother, who walked with a limp, believed to be COPELAND based upon the neighbors' descriptions, were living in the upper unit of 3031 N. 48th Street. The neighbors reported that soon after Orlando and his brother moved in, there was constant "foot traffic" to the upper unit during the day and at night time. The visitors would stay for a few minutes and leave. They also heard loud hammering sounds, particularly at night time.

### D. Telephone Toll Analysis

106. Law enforcement has collected toll records for two of COPELAND's known phone numbers: 414-722-2999; and 414-699-9792. The table below reflects the contacts these numbers have had with phone numbers associated with the other Target Subjects during the

specified date range. Based upon the investigation to date, I believe that COPELAND utilizes other phone numbers in addition to these two numbers. In addition, I believe that the other Target Subjects likely use other phone numbers in addition to the ones listed below.

|  | (414) 722-2999 **Joseph COPELAND** 8/28/2017 to 5/30/2018 | (414) 699-9792 **Joseph COPELAND** 10/03/2017 to 5/30/2018 |
|---|---|---|
| **Craig DELANEY** 414-233-7607 | Total Contacts: 139 | Total Contacts: 0 |
| **Kevin DELANEY** 414-306-0815 | Total Contacts: 334 | Total Contacts: 7 |
| **Orlando COPELAND** 414-759-1517 | Total Contacts: 11 | Total Contacts: 46 |
| **Brandon M. ELLIS** 414-739-1686 | Total Contacts: 30 | Total Contacts: 0 |
| **Latrice JINOR** 414-391-1895 | Total Contacts: 35 | Total Contacts: 137 |

### E.     Law Enforcement Physical Surveillance

107.     Over the course of the last several months, case agents have conducted spot-check surveillance of the Target Locations and Target Subjects on a number of occasions. Below are some examples of their observations.

108.     On March 19, 2018, case agents conducted surveillance at the duplex located at 5123/5125 N. 68th St in Milwaukee, WI. Case agents know that JINOR lives in the upper unit of this duplex (5125 N. 68th St.). JINOR is COPELAND's cousin. JINOR's mother, Mildred Jinor, lives in the lower unit of this duplex (5123 N. 68th St.). On March 19, 2018, case agents observed COPELAND in the driver's seat of a white 2015 Range Rover SUV bearing Wisconsin license plate AAU9139 parked in front of this residence. COPELAND was the sole occupant of the Range Rover. A short time later, a teenage female exited the front door of the residence of 5123/5125 N. 68th Street. The female leaned into the front passenger window of the vehicle. After approximately one minute, the female subject returned to the residence. COPELAND then drove to the 2400 block of N. 44th Street. He parked the Range Rover and walked to the front

42

steps of a duplex at 2475/2477 N. 44th Street holding a white, plastic bag. He entered the front door of the duplex.

109.     On April 3, 2018, Task Force Officers from the North Central High Intensity Drug Trafficking Area (HIDTA) conducted surveillance at a suspected drug trafficking location in the city of Milwaukee, as part of a separate HIDTA investigation. During the late afternoon, a maroon Mitsubishi Eclipse, WI plate 5789AB (Milwaukee Brewers plate) pulled up and parked in the business lot. The driver (later identified as COPELAND) exited. COPELAND walked towards the building and appeared to have a limp. COPELAND was carrying a large, black backpack near his left leg and it was full and bulging. Shortly thereafter, COPELAND exited the business and walked to the Eclipse. At that time, COPELAND had the black backpack in his right hand and it was full of an object(s). COPELAND entered the driver's door and sat inside. A short time later, COPELAND drove away in the Eclipse. Later that day, HIDTA case agents located the Eclipse parked in the driveway at 3149 N. 47th Street. As HIDTA case agents drove by, COPELAND was exiting the front door of 3149 N. 47th St. and walking down the porch. COPELAND was wearing the same grey outfit and baseball hat as he wore at the suspected drug trafficking location earlier that day and was holding what appeared to be the same black backpack. Moments later, case agents saw the Eclipse back out of the driveway and leave the area.

110.     On April 16, 2018, in the afternoon, case agents conducted surveillance at COPELAND's residence (3149 N. 47th Street). Case agents observed COPELAND exit the front door of 3149 N. 47th St. and clean snow from the dark gray/black 4-door 2010 BMW 750Li. While COPELAND cleaned the BMW, case agents observed what appeared to be a long black gun magazine extending from COPELAND's left, front jeans pocket.

43

111. On May 1, 2018, in the afternoon, case agents conducted surveillance at COPELAND's residence (3149 N. 47th Street). Case agents observed COPELAND exit the front door of the residence and enter his 2010 BMW 750Li sedan, bearing WI license plate 606YNL. COPELAND drove the BMW away from his residence and stopped in front of the duplex at 2929/ 2931 N. 57th Street. After waiting for a brief time, COPELAND drove to the above-mentioned suspected drug trafficking location being investigated by HIDTA. After being at this location for approximately 10 minutes, COPELAND drove away from the area.

112. On May 1, 2018, case agents also conducted surveillance at 3049A N. 46th Street (known to be CD's residence). CD was observed at the residence on the front porch. CD's vehicle, a 2000 Chevrolet Tahoe bearing WI license plate KH2645, registered to CD, was also parked in front of the residence. On at least one occasion, a case agent has observed CD driving the 2000 Chevrolet Tahoe, and on multiple occasions, case agents have observed this car parked in front of the residence at 3049A N. 46th Street.

113. Also on May 1, 2018, case agents conducted surveillance at 4689 N. 19th Street (known to be ORLANDO's residence). ORLANDO was observed coming and going from the residence and sitting on the porch. ORLANDO's vehicle, a black, 4-door 2000 Mercedes Benz E Class bearing Wisconsin license plate 667XER, was parked in driveway.

114. On May 9, 2018, case agents conducted surveillance at 3149 N. 47th St. (COPELAND's residence). COPELAND's vehicle (the 2010 BMW 750Li bearing WI license plate 606YNL) was parked in the driveway. Case agents also observed a blue 2006 Lexus bearing WI license plate 695YPF parked at the end of the driveway. A Wisconsin Department of Transportation query revealed that the Lexus was registered to Kathy A. Copeland at the address of 2870 N. 49th Street. On May 9, 2018, case agents observed Kathy Copeland exit the front door of the residence of 3149 N. 47th Street. COPELAND stood in the doorway of the residence

as Kathy Copeland walked to the Lexus, entered the driver's seat, and drove away. COPELAND then closed the front door of the residence.

115. On May 9, 2018, case agents also conducted surveillance at 5125 N. 68th St. (known to be JINOR's residence). Case agents observed a white 4-door 2016 Mercedes Benz C Class with Wisconsin plates 277YTF pull into the alley between N. 68th St. and N. 69th St. The Benz backed into the driveway behind 5125 N. 68th St. After the vehicle parked, case agents observed JINOR exit the driver's door of the vehicle.

116. The COPELAND DTO is suspected of amassing large amounts of bulk cash from the sales of narcotics. COPELAND has not filed a federal tax return in at least the last five years. However, based upon physical surveillance, source information, and a review of publicly viewable Facebook records, COPELAND is frequently in possession of luxury items, such as high-end vehicles and jewelry, and large amounts of cash. Cooperating sources have reported that COPELAND has other individuals, including JINOR, launder drug proceeds for the DTO.

**F. Social Media Records**

117. Based upon my review of publicly viewable information on the Internet, it appears that COPELAND uses Facebook username **"Joe Copeland,"** (**User ID#: 100006695238878**) and Instagram username **"BIGJOEMIL."** On a number of occasions, photographs of large stacks of U.S. currency are posted to COPELAND's Facebook and Instagram pages. In some of the photos, the money is stacked and bound by rubber bands or spread out to display the value of the bills. Various photographs show bundles of money on the passenger seat of a vehicle, or in the passenger foot well displaying a Range Rover rubber floor mat. In other photos, COPELAND is posing with large stacks of money spread out on his lap with a hand gun or held up to the side of his face.

118. Photographs and videos of COPELAND in possession of handguns are frequently posted to COPELAND's social media pages. For example, on March 24, 2017, and September 29, 2017, photographs were posted to the Instagram account "**BIGJOEMIL**" showing COPELAND with what appears to be a Glock pistol with an extended 30 round magazine. On October 26, 2016, a video was posted showing an FN Five-seveN handgun with magazines and ammunition. The FN has double-stacked extended magazines containing blue polymer tipped 5.7x28mm sub-machinegun ammunition. A video posted to Instagram account "**BIGJOEMIL**" on October 27, 2016, shows COPELAND practicing head shots on a paper target at a shooting range with the FN Five-seveN. A FN Five-seveN is listed at $1,399 MSRP. Similarly, on August 5, 2017, a photograph was posted to COPELAND's Facebook page showing COPELAND posing near the hood of the white Range Rover agents have surveilled him driving. An extended firearm magazine is hanging out of the left side of COPELAND's waistband. The message associated with the photo states that COPELAND is at Marquise's Barber & Salon (in Milwaukee). On August 20, 2017, COPELAND appears in a selfie-style video posted to his Facebook page. In the video, COPELAND has a firearm with an extended magazine in his hand and he displayed it for the camera.

119. On February 19, 2018, and February 20, 2018, videos were posted on COPELAND's Facebook page that show COPELAND displaying a variety of expensive designer clothing items and jewelry, including a Rolex watch, a Robin's Jeans jacket, True Religion jeans, and various new designer footwear items. The videos have a posted location of Los Angeles, California. Some videos show price tags for the items. For example, the price tag for the Robin's Jeans jacket lists the price as $1,700. The price tags for multiple pairs of True Religion jeans display prices upwards of $383.00 per pair. On February 19, 2018, there is a photo posted to COPELAND's Facebook page showing COPELAND wearing many of the items

46

shown in the videos posing with another male in a hotel room. The post indicates that COPELAND was at the W Hotel Los Angeles in West Beverly Hills. Additionally, there is a video posted on February 18, 2018, on COPELAND's Facebook account, in which COPELAND is in the backseat of a moving vehicle taking a selfie-style video. In the video, COPELAND displays two tickets to the 2018 NBA All-Star basketball game in Los Angeles with the listed price of each ticket as $1,000.

V.    **CONCLUSION**

120.    Based upon the facts contained within this affidavit, I submit that there is probable cause to believe that from at least 2011, until the present, JOSEPH COPELAND, a.k.a. "Big Joe," a.k.a. "Joe Millionaire," knowingly conspired with others known and unknown to possess with intent to distribute and to distribute controlled substances, including at least 500 grams of cocaine and at least 100 grams of heroin, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), and 846. In addition, I submit that there is a probable cause to believe that COPELAND conspired with others known and unknown to commit money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957. Further, there is probable cause to believe that on or about February 20, 2017, JOSEPH COPELAND possessed a firearm during and in furtherance of a drug trafficking crime, to wit possession with intent to distribute controlled substances, in violation of Title 18, United States Code, Sections 924(c) and 2. Finally, I submit that there is probable cause to believe that evidence of the aforementioned crimes will be found within the Facebook and Instagram accounts listed in this affidavit and further described in Attachment A.

## ATTACHMENT A

### *Property to Be Searched*

Information associated with the following Facebook and Instagram accounts/usernames:

**Facebook username "Joe Copeland" under Facebook User ID#: 100006695238878**

**and Instagram username "BIGJOEMIL"**

that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., located at 1601 Willow Road, Menlo Park, CA 94025.

# ATTACHMENT B

## *Particular Things to be Seized*

I. **Information to be disclosed by Facebook, Inc.**

To the extent that the information associated with the accounts/usernames described in Attachment A is within the possession, custody, or control of Facebook, Inc., including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), **from January 1, 2015, through the present,** Facebook is required to disclose the following information to the government for each account listed in Attachment A:

a. Any and all business records maintained by Facebook regarding the requested Facebook account;

b. All contact and personal identifying information, including User ID name, full name, user identification number, birth date, gender, contact e-mail addresses, passwords, security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

c. All port data;

d. All metadata, including geolocation data, from photographs or other documents or information associated with the account, regardless of whether such metadata is posted to or available on the subscriber's Facebook page;

e. All applications, websites, or other service, sites, or account for which the logins for the requested accounts are used or to which the requested accounts are linked or synced;

f. Any unique advertising ID associated with any device used to access or log into the requested Facebook accounts;

g. All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

h.     All Photoprints, including all photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

i.     All audio and video files uploaded by that user or channel, or that have that user tagged or identified in them;

j.     All Neoprints, including profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

k.     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

l.     All "check ins" and other location information;

m.     All IP logs, including all records of the IP addresses that logged into the account;

n.     All records of the account's usage of the "Like" feature, including all Facebook and all non- Facebook webpages and content that the user has "liked";

o.     All information about the Facebook pages or channels that the account is or was a "fan" of;

p.     All data and information that has been deleted by the user;

q.     A list of all users that the account has "unfollowed" or blocked;

r.     All "lists" created by the account;

s.     All information on the "Who to Follow" list for the account;

t.     All past and present lists of friends created by the account;

u.     All records of Facebook searches performed by the account;

v.     All information about the user's access and use of Facebook Marketplace;

w.    The types of service utilized by the user;

x.    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

y.    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which users have been blocked by the account; and

z.    All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**II.    Information to be seized by the United States**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of federal law, specifically: conspiracy to possess with intent to distribute and distribute controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957; and possession of firearms during and in relationship to drug trafficking, in violation of Title 18, United States Code, Section 924(c), from January 1, 2017, to the present, for the accounts/usernames identified in Attachment A, including the following:

a.    Messages, correspondence, documents, photographs, videos, recordings, and records pertaining to the possession, purchase, use, trafficking, and distribution of narcotics; and

b.    Messages, correspondence, documents, photographs, videos, recordings, and records pertaining to the possession, purchase, use, trafficking, and sales of firearms;

c.    Messages, correspondence, documents, photographs, videos, recordings, and records pertaining to the purchase, acquirement, and disposal of assets using drug proceeds;

d.    Messages, correspondence, documents, photographs, videos, recordings, and records pertaining to the identity and location of the account user(s).